# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **LISA ARNOLD, BRANDI TROUT, and SANDRA GOLDEN-WOODS, on behalf of the Churchill Holdings, Inc. Employee Stock Ownership Plan, and on behalf of a class of all other persons similarly situated,** | |
| **Plaintiffs,** | **Case No.** |
| **v.** | |
| **MIGUEL PAREDES, PRUDENT FIDUCIARY SERVICES, LLC, LAWSON H. HARDWICK, III, MATTHEW C. CLARKE, AND CECIL O. KEMP, JR.** | |
| **Defendants.** | |

## COMPLAINT

Plaintiffs Lisa Arnold, Brandi Trout, and Sandra Golden-Woods, by their undersigned attorneys, on behalf of the Churchill Holdings, Inc. Employee Stock Ownership Plan, and similarly situated participants in the Plan and their beneficiaries, allege upon personal knowledge, the investigation of their counsel, their counsel's knowledge and experience in ESOPs and the practices of ESOP trustees and their advisors, and upon information and belief as to all other matters, as to which allegations they believe substantial evidentiary support will exist after a reasonable opportunity for further investigation and discovery, as follows:

## BACKGROUND

1.      Plaintiffs Lisa Arnold, Brandi Trout, and Sandra Golden-Woods, ("Plaintiffs") sue Miguel Paredes and his operating company Prudent Fiduciary Services, LLC ("PFS", and together, the "Trustee"), the fiduciary trustee for the Churchill Holdings, Inc. Employee Stock

Ownership Plan (the "Plan" or the "ESOP"); Lawson H. Hardwick, III ("Hardwick"), the party in interest shareholder from whom the Plan acquired Churchill Holdings, Inc. ("Churchill") stock; and Matthew C. Clarke and Cecil O. Kemp, Jr., who are with Hardwick the members of Churchill's Board of Directors.

2. Plaintiffs are participants in the Plan, as defined by ERISA § 3(7), 29 U.S.C. § 1002(7), who were vested under the terms of the Plan in shares of Churchill allocated to their accounts in the Plan.

3. Plaintiffs sue under Sections 404, 406, 409, and 502(a) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. §§ 1104, 1106, 1109, and 1132(a), for losses suffered by the Plan and its participants when: (1) the Plan failed to receive all benefits of dividends held by the Plan on preferred shares of Churchill acquired on or about October 31, 2013 and earned in 2014, 2015, 2016, 2017, 2018 and 2019; and (2) the Trustee caused the Plan to buy the remaining issued shares of Churchill for more than fair market value on or about December 24, 2020 (the "2020 Transaction") and thereby misused the Plan's money to the benefit of Hardwick, and other plan-wide relief.

4. As alleged below, the Plan and its participants have been injured and participants have been deprived of hard-earned retirement savings resulting from Defendants' violations of ERISA.

5. At all relevant times, Churchill was a privately held company and party in interest to the Plan. Prior to October 31, 2013, Hardwick was the sole shareholder. Around 2013, Hardwick wished to begin cashing out his equity in Churchill while maintaining his control over the company.

6.     On or about October 31, 2013, Churchill, at Hardwick's direction, created the ESOP, which was effective retroactive to January 1, 2013, and Hardwick sold 490,000 shares of Series A Preferred Stock in Churchill Holdings, Inc. ("Preferred Shares") to the ESOP for $30 million. These shares represented 49 percent of all issued Churchill stock at the time, and Hardwick maintained his controlling interests in Churchill as majority shareholder, and as the sole owner of issued Churchill common stock, which represented 51 percent of all issued Churchill stock at the time.

7.     To facilitate this stock purchase, the Plan took out a promissory note payable to Hardwick (subsequently assumed by the Company) and secured by the unallocated shares of Preferred Stock in an amount equal to the purchase price (the purchase and loan transactions together, the "2013 Transaction").

8.     The Preferred Shares entitled the Plan (and its participants) to annual dividends of approximately $4.90 per share ($2.4 million annually for the Plan's 490,000 shares).

9.     In each year, $2.4 million in dividends was deposited into the Plan, but in most years a significant portion of the dividends were used to offset corporate obligations, like ESOP contributions, instead of being used for the benefit of the Plan and its participants, like paying interest and principal on the 2013 Note or crediting dividends to the Plan accounts of participants who held shares of Churchill stock. Thus, Hardwick—who was a Director, the President and Chief Executive Officer (CEO), and the sole owner of common stock—converted plan assets for his and his company's own use and benefit.

10.    Then, on December 24, 2020, Hardwick sold his remaining equity in Churchill—510,000 shares of common stock—to the Plan for $74,406,876. That transaction was financed

3

through a note payable to Hardwick (the "2020 Note"), which Churchill subsequently assumed from the Plan. This sale and financing are referred to as the "2020 Transaction."

11. Each share of ESOP-held preferred stock had been valued at $52.25 as of December 31, 2019. But only a few months later, the Plan paid Hardwick $145.90 per share of common stock in the 2020 Transaction. Thus, the Plan paid Hardwick almost three times what Churchill preferred stock had been valued less than a year earlier.

12. This massive difference in value cannot be attributed to differences between preferred and common stock because, among other things, the value of preferred stock included a dividend. Not can it be attributed to the Plan acquiring a controlling stake in the company because no control premium could justify a multiple this high.

13. The Trustee represented the Plan and its participants as fiduciary trustee in the 2020 Transaction. It had sole and exclusive authority to negotiate the terms of the 2020 Transaction and to authorize the Transaction on the Plan's behalf. The Trustee caused stock and loan transactions between the Plan and parties in interest that were prohibited transactions under ERISA § 406(a), 29 U.S.C. § 1106(a).

14. The 2020 Transaction allowed Hardwick to unload his stake in Churchill above fair market value, for the reasons explained herein, and saddle the Plan and Churchill with tens of millions of dollars of debt to finance the Transaction. This harmed the ESOP and reduced the value of the shares in Plaintiffs' ESOP accounts by massively leveraging Churchill and thereby reducing the equity value of Churchill stock owned by the ESOP and Plaintiffs in their ESOP accounts.

15. As a member of the board and a 10% or more owner of Churchill, Hardwick was a party in interest to the Plan who sold shares in the 2020 Transaction and received proceeds

from the Transaction, and who loaned money to the Plan. Hardwick is liable under ERISA for knowingly participating in the prohibited stock and loan transactions and the Trustee's breaches of fiduciary duty under ERISA and, with the other Board Defendants, as co-fiduciary to the Trustee who participated in, enabled, and/or did not make reasonable efforts to remedy the Trustee's breaches of fiduciary duty.

16.    In addition, as controlling shareholder prior to 2020 and as President/CEO/Director, Hardwick knew that the misuse of Preferred Stock Dividends was against the best interest of the ESOP and its participants and, instead, benefitted his own interests as the majority shareholder of Churchill. Clarke and Kemp also had such knowledge as Directors, and in the case of Clarke, as an officer.

17.    The Company's misappropriation of the Plan's preferred stock dividends, and the decision to pay off the 2013 Note early, both benefitted Hardwick by increasing the value of his Common Stock and facilitating the 2020 Transaction. The Plan and its participants were injured by the misappropriation of the Plan's preferred stock dividends. The Board Defendants breached their fiduciary duties by allowing the dividends to be used to offset corporate obligations and are liable for the Plan's losses and any profits they made in violation of ERISA.

18.    Through this lawsuit, Plaintiffs seek to enforce their rights under ERISA and the Plan, to recover the losses incurred by the Plan and the improper profits realized by Defendants resulting from their causing prohibited transactions and breaches of fiduciary duty or knowingly participating in prohibited transactions and breaches of fiduciary duty, and failing to meet their duties as co-fiduciaries, and equitable relief, including reforming the 2020 Transaction contracts, rescinding the 2020 Transaction, removing the Trustee as a fiduciary and enjoining the Trustee from acting as a fiduciary for any employee benefit plan that covers or includes any Churchill

5

employees or members of the Class, and removing Hardwick, Clarke and Kemp as fiduciaries and enjoining them from acting as fiduciaries for any employee benefit plan that covers or includes any Churchill employees or members of the Class. Plaintiffs request that these prohibited transactions be declared void, Defendants be required to restore any losses to the Plan arising from their ERISA violations, Defendants be ordered to disgorge to the Plan any improper profits, and any monies recovered for the Plan to be allocated to the accounts of the Class members.

## JURISDICTION AND VENUE

19.     This action arises under Title I of ERISA, 29 U.S.C. §§ 1001 *et seq.*, and is brought by Plaintiffs under ERISA § 502(a), 29 U.S.C. § 1132(a), to require the Trustee and other fiduciary defendants to make good to the Plan losses resulting from their violations of the provisions of Title I of ERISA, to obtain appropriate equitable relief against Defendants, to restore to the Plan any profits that have been made by breaching fiduciaries and parties in interest through the receipt or use of Plan assets in violation of ERISA, and to obtain other appropriate equitable relief and legal remedies in order to redress violations and enforce the provisions of ERISA.

20.     This Court has subject matter jurisdiction over this action pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

21.     Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, because some of the events or omissions giving rise to the claims occurred in this District, and because one or more Defendants reside or may be found in this District. The Plan is administered in Brentwood, Tennessee.

22.     The Plan Document provides that any legal action or proceeding brought in federal court in connection with the Plan must be brought in the United States District Court, Middle District of Tennessee.

## PARTIES

23.     Plaintiff Lisa Arnold is a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), since the adoption of the Plan. Plaintiff Arnold resides in Madison County, TN. She was a Senior Underwriter at Churchill. She was employed there from February 2013 to September 2018. She holds vested shares of Churchill in her Plan account.

24.     Plaintiff Brandi Trout is a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), since the adoption of the Plan. Plaintiff resides in Wilson County, TN. She held several positions at Churchill, the most recent being a Sr. Underwriter and Assistant Team Lead. She was employed there from December 2009 to March 2020. She holds vested shares of Churchill in her Plan account.

25.     Plaintiff Sandra Golden-Woods is a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), since the adoption of the Plan. Plaintiff Golden-Woods resides in Wilson County, TN. She held multiple positions at Churchill, most recently being Mortgage Closer Manager. She was employed there from November 2010 to July 2018. She holds vested shares in her Plan account.

26.     Defendant Prudent Fiduciary Services, LLC ("PFS") is a California Limited Liability Company providing trustee services to privately held companies wishing to sponsor Employee Stock Ownership Plans. PFS was founded in 2017. Its headquarters is at 100 N. Barranca St., Suite 400, West Covina, CA 91791.

27.     Defendant Miguel Paredes is and was at the time of the 2020 Transaction the founder, President and owner of PFS. His business address at PFS is 100 N. Barranca St., Suite 400, West Covina, CA 91791.

28.     PFS and Paredes were the Trustee of the Plan at the time of the 2020 Transaction. The Trustee had sole and exclusive discretion to authorize and negotiate the 2020 Transaction on behalf of the Plan. Defendant Paredes was, at all relevant times, the sole member of PFS and the decision-maker for PFS in its role as trustee of the Plan. PFS acted in the 2020 Transaction through Miguel Paredes. PFS provides a team of approximately fifteen full-time individuals to execute ESOP transactions including an in-house business appraiser, a routine due diligence process, office space, and insurance.

29.     The Plan's Summary Plan Description dated May 2021 ("SPD") identifies the trustee as Miguel Paredes c/o Prudent Fiduciary Services, LLC.

30.     At the time of the 2020 Transaction, the Trustee was a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it was the trustee within the meaning of ERISA § 403(a), 29 U.S.C. § 1103(a), and because it exercised discretionary authority or discretionary control respecting management of the Plan, and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan. The Trustee is also a named fiduciary of the Plan, within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a).

31.     Defendant Lawson ("Mike") H. Hardwick, III is and was at all relevant times the President, CEO and a Director of Churchill. He was the selling shareholder in the 2013 and 2020 Transactions and, except for the ESOP, was the only shareholder of Churchill during the relevant

period. He resides or may be found in this District, as he resides in Franklin, Tennessee and Churchill's headquarters is in Brentwood, Tennessee, which is his reported business address.

32.     Defendant Hardwick was a party in interest under ERISA § 3(14), 29 U.S.C. § 1002(14), at all relevant times as a Churchill officer, director, 10 percent or more shareholder, 50 percent or more shareholder of voting stock or the total value of all issued shares, and Plan fiduciary.

33.     Defendant Matthew C. Clarke joined Churchill in 2003 and was at all relevant times an officer of the company, serving as Secretary, Chief Financial Officer (CFO), and Chief Operations Officer (COO). Defendant Clarke was a Director of Churchill prior to the 2020 Transaction, at the time of the 2020 Transaction, and after the 2020 Transaction, continuing to the present. He reports his business address as Churchill's address in Brentwood, Tennessee.

34.     Defendant Cecil O. Kemp, Jr. is Defendant Hardwick's personal coach and mentor. Defendant Kemp was a Director of Churchill prior to the 2020 Transaction, at the time of the 2020 Transaction, and after the 2020 Transaction, continuing to the present. His business address is reported as Churchill's address in Brentwood, Tennessee.

35.     Defendants Hardwick, Clarke, and Kemp (collectively the "Board Defendants") comprised the Churchill Board of Directors (the "Board") prior to the 2020 Transaction, at the time of the 2020 Transaction, and after the 2020 Transaction, continuing to the present. The Board was and is the Plan Administrator, having the powers, duties and responsibilities of Churchill in that function. The Board also had the fiduciary power to appoint and remove other Plan fiduciaries, to wit, the Plan's trustee and administrative committee, if any. The Board Defendants were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A) because they exercised discretionary authority or discretionary control respecting management of the Plan,

and/or exercised authority or control respecting management or disposition of the Plan's assets, and/or had discretionary authority or discretionary responsibility in the administration of the Plan.

## FACTUAL ALLEGATIONS

36. Churchill Holdings, Inc. ("Churchill") is the parent company of its wholly-owned subsidiary Churchill Mortgage Corporation, which was founded in 1992. Churchill does business as Churchill Mortgage Corporation. Churchill is a mortgage lender based in Brentwood, Tennessee. Defendant Hardwick founded Churchill and was its sole shareholder until the 2013 Transaction and its majority shareholder (and sole shareholder other than the ESOP) between the 2013 and 2020 Transactions.

37. Churchill is headquartered at 1749 Mallory Lane, Suite 100, Brentwood, Tennessee 37027. That address is listed as the Plan Administrator's address in the Plan's SPD, and as the address for Defendant Hardwick in the Williamson County Property Assessment Database.

38. Churchill preferred stock and common stock are not and never were readily tradeable on an established securities market.

39. The Plan is a pension plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2), and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1).

40. The Plan is a leveraged employee stock ownership plan, or "Leveraged ESOP." The Plan was designed to invest primarily in the employer securities of Churchill.

41. The Plan's principal asset has been Churchill stock at all times since the 2013 Transaction.

42.     The Plan is an individual account plan, or defined contribution plan, under which a separate individual account was established for each participant.

43.     The Plan's participants are current and former employees of Churchill, including its subsidiary, Churchill Mortgage Corporation. The Plan covers substantially all employees of Churchill.

44.     Churchill is and was from the inception of the Plan the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B).

45.     The Plan's Forms 5500 identify Churchill as the sponsor and administrator of the Plan.

46.     The Plan's SPD says Churchill is the administrator of the Plan.

47.     Churchill is and was the Plan's administrator within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A).

48.     Churchill is and was an ERISA fiduciary to the Plan as its administrator.

49.     Churchill exercised its ERISA fiduciary functions and duties through its board of directors. The members of the Board, thus, functioned as fiduciaries.

50.     Churchill is a named fiduciary of the Plan, within the meaning of ERISA § 402(a), 29 U.S.C. § 1102(a).

51.     Churchill is and was at all relevant time periods a party in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14).

52.     On October 31, 2013, the Plan, through its ESOT (Employee Stock Ownership Trust), purchased from Hardwick 490,000 shares of Series A Preferred Stock for $30,000,000, while Hardwick kept 510,000 shares of common stock in Churchill.

53.     In each subsequent year, the Preferred Stock was due $4.90 per share in dividends, meaning that the Plan was to receive $2.4 million per year in dividends.

54.     Preferred Stock was held by the Plan in an unallocated account except to the extent that shares accrued to participants and were allocated to their individual plan accounts over time.

55.     As of December 31, 2016, there were 238,508.83 unallocated Preferred Shares.

56.     As of December 31, 2017, and December 31, 2018, there were 189,709.44 unallocated Preferred Shares.

57.     In 2020, the Company allocated the remaining Preferred Shares.

58.     In each year the Plan received $2.4 million in dividends from the Preferred Shares.

59.     The $2.4 million per year was used, in part, to pay principal and interest on the note used to finance the purchase of the 490,000 Preferred Shares as part of the 2013 Transaction. However, the dividends represented more than double the income necessary to make payments on the note.

60.     In most years, Defendants used the remaining income from the Plan (and Plan participants') Preferred Shares for corporate purposes and not for the benefit of the Plan. In particular, the excess dividend payments were used to offset Churchill's obligations to make contributions to the ESOP as an employee benefit.

61.     In 2017, $1,290,744 in dividends were improperly used to offset employer contributions into the Plan.

62.     In 2018, $1.9 million in dividends were improperly used to offset employer contributions into the Plan.

63.     In 2019, $249,450 was used to pay interest expenses on the 2013 Note, while the remainder of the $2.4 million in dividends was used to offset corporate expenses.

64.     Plan participants who held vested preferred stock in their ESOP accounts were entitled to receive dividends, but Defendants misappropriated those funds for other purposes.

65.     Section 5.03(d) of the Plan Document required dividend payments be made in cash and dividends on Company Stock allocated, or allocable to the participant's Company Stock Account.

66.     On December 24, 2020, Hardwick sold the remaining equity in Churchill, 510,000 shares of common stock, to the Plan for $74,406,876, a sale price of $145.90 per share, nearly triple the most recent valuation of $52.25 done as of December 31, 2019.

67.     The dramatically higher share price for the 2020 Transaction should have alerted all Defendants that the Plan was paying Hardwick more than it should have for Churchill stock.

68.     Churchill even produced a video based on the considerable rise in price ahead of the 2020 Transaction, in which participants expressed disbelief and surprise in response about the share price.[1]

69.     The 2020 Transaction was financed through a note payable to Hardwick (the "2020 Note"), which Churchill subsequently assumed from the Plan. The parties resorted to seller financing because they were unable to arrange bank financing for the 2020 Transaction. Prospective bank lenders would have been troubled by the fact that the proposed Transaction

---

[1] https://m.facebook.com/churchillmortgagetc/videos/did-you-know-churchill-mortgage-is-100-employee-owned-one-vehicle-that-helps-our/4855328301214895/. Several employee testimonials are consistent with, for example, Sr. Processor Melissa Baughman's reaction that the valuation "took my breath away. I couldn't believe the number... I couldn't believe it, honestly", or Sr. Processor Jennifer Veilleux who "was very startled and surprised", or Branch Manager Sandi Green who commented on seeing the valuation of the shares: "Holy smokes. I actually had to look at the figure more than once because I thought it had to have been a mistake."

would be 100% leveraged. A prudent bank would not have financed the transaction at the $74,406,876 value in light of the prior annual valuation of preferred stock at approximately 1/3 that value and without conducting robust due diligence on the loan to ensure that the collateral pledged, the stock, was actually worth $74,406,876. Because the parties could not obtain, or knew they could not obtain, bank financing for the transaction, they "financed" the transaction with a note payable to Hardwick. The loan was not primarily for the benefit of participants and beneficiaries of the Plan, but rather was arranged in the interest of Hardwick to provide the liquidity enabling him to divest himself of Churchill with the Plan's purchase of his shares in the prohibited and imprudent Transaction.

70.     Because Churchill assumed the 2020 Note, the liability on that debt became a liability of Churchill, thereby depressing the equity value of existing stockholders, such as Plaintiffs, by approximately $74 million.

71.     As trustee for the Plan, it was the Trustee's duty to ensure that any transactions between the Plan and Hardwick and between the Plan and Churchill, including acquisitions of Churchill stock by the Plan and loans to the Plan, were fair and reasonable and to ensure that the Plan paid no more than fair market value.

72.     Hardwick and his friends on the Board, through Churchill, appointed the Trustee. As trustee, the Trustee had sole and exclusive authority to negotiate and approve the 2020 Transaction on behalf of the Plan, including the price the Plan paid for Churchill stock it purchased from Hardwick. Hardwick, who was the seller-side in the 2020 Transaction, therefore appointed the buyer-side counter-party trustee in the 2020 Transaction.

73.     "[T]he ESOP world [is] a very incestuous community" because of the "significant long-term business relationships" resulting from parties working together in many ESOP deals,

and ESOP trustees maintain "extensive and lucrative business relationships" with seller-side advisors. *See Brundle v. Wilmington Tr., N.A.*, 919 F.3d 763, 771, 779 (4th Cir. 2019) (citation omitted). Hardwick, through Churchill, appointed the Trustee to be the buyer-side trustee on advice of his ESOP advisors. An unconflicted independent fiduciary did not make the appointment.

74.     The Trustee received fees from Churchill for its services as transaction trustee in the 2020 Transaction to the buyer-side Plan under a contract made under Hardwick's ownership and control of Churchill. The Trustee received fees after the 2020 Transaction as ongoing trustee to the Plan, carrying over its appointment by Hardwick after the ESOP became owner of the company.

75.     Although Churchill boasts that since the 2020 Transaction it is 100% employee owned, after the 2020 Transaction the Board Defendants, including Hardwick, continued to control Churchill as officers and directors, and Hardwick continued to serve as President and CEO, and appointed the Board of Directors, directly or indirectly.

76.     Board Defendants were centrally involved in conceiving of, facilitating, and executing the 2020 Transaction. Hardwick and Clarke particularly were involved in directing the preparation of financial statements and projections by their team of subordinate Churchill management for use in valuations in the 2020 Transaction.

77.     In connection with the 2020 Transaction, Board Defendants adopted the Articles of Amendment to the Charter of Churchill Holdings, Inc. by unanimous written consent as of December 22, 2020, that is, two days before the 2020 Transaction on December 24, 2020. Defendant Hardwick also approved the Articles of Amendment as shareholder, and Defendant Clarke signed them on behalf of Churchill. The Articles of Amendment created a new class of

Churchill stock: the 510,000 shares of Class B Common Stock that Hardwick sold to the Plan. That Class B Common Stock was previously classified as Class A Common Stock.

78. The December 22, 2020 Articles of Amendment to the Charter of Churchill Holdings, Inc. further provided that "a holder of the Class B Common Stock shall have the exclusive right to receive a special 2020 year-end distribution in the form of a cash dividend, if and when declared by the Company's board of directors at any time after December 25, 2020, but prior to December 31, 2020." The ESOP was the only holder of Class B Common Stock between December 25 and December 31, 2020. By this provision, Board Defendants made possible the Plan's payment, within days of the 2020 Transaction, to Hardwick (as a loan repayment) of $35 million of Churchill cash it had just purchased with Churchill. By vesting sole discretion in themselves to declare dividends for the Plan-owned Churchill stock, Defendants gave themselves functional control over Plan assets. This was also true during the period 2013-2020 with respect to preferred stock.

79. Hardwick at all relevant times controlled Churchill through: his status as Director, President and CEO in 2013 and at all times from then to the 2020 Transaction, at the time of the 2020 Transaction, and after the 2020 Transaction to the present; his appointees or proxies holding positions as officers and/or directors; due to the millions of dollars of Plan and company debt he held from selling stock to the ESOP in the 2013 and 2020 Transactions, including but not limited to rights arising from synthetic equity (warrants and stock appreciation rights (SARs)) issued to him, which is trumpeted by the Trustee for use in ESOP transactions; through various transaction documents, including the stock purchase agreement and warrants; his authority and/or influence in appointing directors; and through a compliant trustee that could be fired by Churchill or its board of directors.

16

80.     One example of Hardwick exercising this control even after the 2020 Transaction was that he, with approval of the Board, caused Churchill to pay a special $43,400,000 "dividend" payment at the end of 2020, for which $35,000,000 was applied to debt service, $2,400,000 was retained by the Plan for operating funds, and $6,000,000 was reported as a dividend received in the statements of net assets available for benefits and applied against the 2020 Note in 2021. This was the "special year-end dividend" allowed by the December 22, 2020 Articles of Amendment to the Charter of Churchill Holdings, Inc. By declaring this dividend in the days following the 2020 Transaction, Board Defendants allowed Hardwick to massively accelerate the ESOP's payments to him due under the 2020 Note. This had the effect of stripping the company of cash needed for operations and massively increasing the value of Hardwick's warrants.

81.     The Plan and its participants did not take control of Churchill from Hardwick in the 2020 Transaction conceived and effectuated by Hardwick, his ESOP advisors, and the Trustee.

82.     The Trustee valued Churchill stock on a control basis by using an industry capital structure instead of Churchill's actual capital structure in its income method, which yielded a control value. But the Plan did not obtain control of Churchill, as explained above, because Hardwick maintained control over the board of directors and, through the board, the company. The Plan should have received a discount for lack of control, but it did not. This means the Plan paid more than fair market value for the stock.

83.     The Trustee's appraisal of Churchill stock in the 2020 Transaction used income valuation techniques. Churchill management provided financial statements and projected cash flow and net income to the Trustee for the valuation in the 2020 Transaction. The financial

projections were unreasonably optimistic. The Plan overpaid for Churchill stock in the 2020 Transaction due to the Trustee's reliance on unrealistic growth projections. The Trustee did not adequately challenge information provided by Churchill management or the valuation techniques of its financial advisor and therefore failed to negotiate for the true, lower fair market value price of Churchill stock as of the date of the 2020 Transaction.

84. The Trustee's appraisal of Churchill stock in the 2020 Transaction used market valuation techniques. The appraisal derived value based on supposedly comparable companies to Churchill. But the selected comparable companies were too dissimilar to Churchill to provide a reliable indication of value. Moreover, the discounts applied to the selected multiples derived from the purportedly comparable companies were arbitrary and insufficient to reflect the fair market value of Churchill, yielding a market-based value that substantially overstated the fair market value of Churchill. Thus, the use of market comparables that were not a good match to Churchill caused the stock to be overvalued and the ESOT to overpay.

85. The Trustee failed to apply a sufficient discount for lack of marketability (DLOM) to its valuation in the 2020 Transaction because it failed to sufficiently account for the lack of marketability for the stock that was purchased by the ESOT. The valuation applied an insufficient DLOM because Plan participants, beneficial owners rather than legal owners, have a right to demand that the company buy any shares of its stock distributed to participants for which there is no market (the "put option"). But the Plan was the purchaser in the 2020 Transaction and the participants' put option did not reduce the lack of marketability to the ESOT of the stock the ESOT owned. In addition, the Plan's lack of control over Churchill made it lack marketability. The Plan overpaid for Churchill stock in the 2020 Transaction due to the Trustee's improper application of DLOM.

86.     The Trustee caused the Plan to overpay by agreeing at or around the closing of the 2020 Transaction for Hardwick to take synthetic equity (warrants, SARs) in the 2020 Transaction or post-closing, which diluted the value of the Plan-owned stock. The Trustee's valuation did not for account the dilutive effect of that compensation. The synthetic equity further allowed Hardwick to take consideration in the years following the 2020 Transaction which vastly exceeded a reasonable return on investment because Hardwick accelerated the value of his warrants manifold by causing the special dividend to be paid.

87.     In breach of their duty of loyalty to plans and their participants and beneficiaries, ESOP trustees have defined and employed deficient "industry" standards for themselves alone that deviate from sound business practices employed by non-ESOP buyers in the so-called "real world" and required by ERISA. In accordance with its and "industry" routine practices, the Trustee's due diligence in the 2020 Transaction was less extensive and thorough than the due diligence performed by third-party buyers in corporate transactions of similar size and complexity. Incentives to the Trustee to fail to exercise care, skill, prudence and diligence in the interest of Plan participants and beneficiaries in the 2020 Transaction by failing to apply sound business principles of evaluation and to conduct a prudent investigation and negotiation included the possibility of business from sellers of companies who understood that the Trustee applied a lesser degree of due diligence in ESOP purchases of businesses than is typical for non-ESOP-buyers' purchases of businesses, referrals for such work by other service providers in the ESOP creation and administration business, and engagement as the Plan's ongoing trustee after the 2020 Transaction and the fees paid for that engagement.

88.     The Plan suffered losses due to the overvaluation of Churchill stock in the 2020 Transaction and its overpayment for the stock, in an amount to be determined following

discovery and expert analysis of non-public information concerning the Trustee's and its financial advisor's valuation and due diligence methodologies, Churchill's financials and growth projections, and other documents and information that were considered or should have been considered in the 2020 Transaction.

89.     Due to the Plan's overpayment, the Plan's participants, whose losses are coterminous with the Plan's, received diminished stock allocations, saw their Plan take on excessive debt to finance the Transaction, and suffered losses to their individual Plan accounts where Plaintiffs saw the value of the Churchill stock in their accounts greatly depressed by the debt taken on by Churchill in connection with the 2020 Transaction.

90.     The Trustee is liable to the Plan for the difference between the price paid by the Plan and the fair market value of Churchill shares at the time of the 2020 Transaction. The Board Defendants are liable as co-fiduciaries.

91.     Hardwick is liable to the Plan to repay the difference between the price the Plan paid and the fair market value of Churchill common stock as of the 2020 Transaction.

92.     In addition, the Board Defendants are liable for misappropriating dividends due on the Preferred Stock between 2013 and 2019, which dividends where owed to participants with allocated shares, and failing to use dividends the ESOP earned during that period on non-allocated shares solely for the benefit of the ESOP. In so doing, the Board Defendants not only denied the ESOP and its participants the benefits they were owed as shareholders and under the Plan, but also increased the value Hardwick received for his shares in the 2020 Transaction.

## CLAIMS FOR RELIEF

## COUNT I

### Causing Prohibited Transactions Forbidden by
### ERISA § 406(a), 29 U.S.C. § 1106(a), Against Defendants Paredes and PFS
### Regarding the 2020 Transaction

93.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

94.     ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), prohibits a plan fiduciary, here the Trustee, Defendants Paredes and Prudent Fiduciary Services, from causing a plan, here the Plan, to engage in a sale or exchange of any property, here Churchill stock, with a party in interest, here Hardwick, as took place in the 2020 Transaction.

95.     ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), prohibits the Trustee from causing the Plan to borrow money from a party in interest, here Hardwick and Churchill, as took place in the 2020 Transaction.

96.     ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D), prohibits the Trustee from causing the Plan to engage in a transaction that constitutes a direct or indirect transfer to a party in interest, here Hardwick, of any assets of the Plan, as took place in the 2020 Transaction with the transfer of Plan assets to Hardwick as payment for Churchill stock.

97.     The stock and loan transactions between the Plan and the parties in interest were authorized by the Trustee in its capacity as trustee for the Plan.

98.     The Trustee caused the Plan to engage in prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a), in the 2020 Transaction.

99.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits

of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

100. ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief to a plan under ERISA § 409.

101. The Trustee has caused losses to the Plan and Plaintiffs by the prohibited transactions in an amount to be proved specifically at trial.

## COUNT II

### Breaches of Fiduciary Duty Under ERISA § 404(a), 29 U.S.C. § 1104(a), Against Defendants Paredes and PFS Regarding the 2020 Transaction

102. Plaintiffs incorporate the preceding paragraphs as though set forth herein.

103. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), requires, *inter alia*, that a plan fiduciary discharge his or her or its duties with respect to a plan solely in the interest of the participants and beneficiaries, (A) for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan and defraying reasonable expenses of administering the plan, (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, and (D) in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with ERISA.

104. The fiduciary duty of loyalty entails a duty to avoid conflicts of interest and to resolve them promptly when they occur. A fiduciary must always administer a plan with an "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the fiduciaries themselves or the plan sponsor.

105.     ERISA § 409, 29 U.S.C. § 1109, provides, *inter alia*, that any person who is a fiduciary with respect to a plan and who breaches any of the responsibilities, obligations, or duties imposed on fiduciaries by Title I of ERISA shall be personally liable to make good to the plan any losses to the plan resulting from each such breach, and to restore to the plan any profits of the fiduciary which have been made through the use of assets of the plan by the fiduciary, and additionally is subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

106.     ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2), permits a plan participant to bring a suit for relief to a plan under ERISA § 409.

107.     The Trustee was required to undertake an appropriate and independent investigation of the fair market value of Churchill stock in or about December 2020 in order to fulfill its fiduciary duties, and an appropriate investigation would have revealed that the valuation used for the 2020 Transaction did not reflect the fair market value of the Churchill stock purchased by the Plan.

108.     The Trustee was required to act independently on behalf of the Plan, to probe projections and other information provided by Churchill management, and it did not adequately do so.

109.     The Trustee was required to negotiate for the Plan to pay no more than fair market value for Churchill stock in the 2020 Transaction, and it failed to do so, but instead approved the imprudent Transaction.

110.     The Trustee breached its duties under ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1).

111.     The Trustee has caused losses to the Plan and Plaintiffs by its breaches of fiduciary duty in an amount to be proved specifically at trial.

## COUNT III

**Breaches of Fiduciary Duty Under ERISA § 404(a), 29 U.S.C. § 1104(a),
Against the Board Defendants Regarding Dividend Payments**

112.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

113.    Churchill, as plan sponsor and plan administrator, was a party in interest and a fiduciary to the Plan, and could operate solely through its Board of Directors and officers, who included members of the Board of Directors, Defendants Hardwick and Clarke.

114.    The Board was a fiduciary of the Plan because it converted Plan assets, reclassified dividend payments, for Hardwick and Churchill's own use and therefore exercised discretion and control over such assets. To the extent the dividends or their misuse were approved by an independent trustee, the Board Defendants were fiduciaries of the Plan by virtue of their power to appoint such trustee and duty to monitor the performance of the trustee.

115.    The Board Defendants were fiduciaries of the Plan because they had discretion under the terms of the ESOP loans to use all dividends to pay ESOP notes.

116.    By converting Plan assets for corporate use and to the benefit of Hardwick, the Board Defendants breached their fiduciary duties and violated the exclusive purpose rule.

117.    To the extent they permitted an independent trustee to cause the Plan to engage in prohibited transactions or violate their fiduciary duties to the Plan, the Board Defendants breached their fiduciary duty to monitor such trustee.

118.    The Board Defendants violated their fiduciary obligations, including:

        a.      The duty of loyalty, 29 U.S.C. § 1104(a)(1);

        b.      The duties of care, skill, prudence and diligence, 29 U.S.C.
§ 1104(a)(1)(B);

c.       The duty to hold Plan assets for the exclusive purposes of providing

benefits to participants in the Plan and their beneficiaries, defraying reasonable expenses

of administering the Plan, and making certain that Plan assets never inure to the benefit of

the employer, here Churchill, 29 U.S.C. §§ 1103(c), 1104(a)(1)(A); and

d.       The duty to comply with the requirement to discharge their duties "in

accordance with the documents and instruments governing the plan." 29 U.S.C.

§ 1104(a)(1)(D).

119.     The Board Defendants caused losses to the Plan and Plaintiffs by their breaches of

fiduciary duty in an amount to be proved specifically at trial.

## COUNT IV

**Knowing Participation in ERISA Violations Pursuant to 29 U.S.C. § 1132(a)(3),
Against Hardwick Regarding the 2020 Transaction**

120.     Plaintiffs incorporate the preceding paragraphs as though set forth herein.

121.     ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), *inter alia*, permits a plan participant

to bring a civil action to obtain appropriate equitable relief to redress violations of the provisions

of Title I of ERISA, or to enforce the provisions of Title I of ERISA or the terms of a plan.

122.     The Supreme Court has held that anyone, including a non-fiduciary, who receives

the benefit of conduct that violates ERISA may be subject to equitable remedies under ERISA

§ 502(a)(3) if they have "actual or constructive knowledge of the circumstances that rendered the

transaction unlawful." *Harris Trust & Sav. Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238,

251 (2000).

123.     As a result of the prohibited stock transaction in 2020 described above, Hardwick

received Plan assets in payments above fair market value for his Churchill stock.

124.    Hardwick was a party in interest to the Plan under ERISA § 3(14), 29 U.S.C. § 1002(14), as described above.

125.    Hardwick knew or should have known (1) about the existence of the Plan, (2) about the Plan's purchase of his Churchill stock in the 2020 Transaction, (3) that the Trustee was the fiduciary trustee to the Plan, (4) that he was a Churchill officer, director and 10% or more shareholder, or otherwise a party in interest, (5) that he lent money to the Plan in the 2020 Transaction, and (6) that the Trustee caused the Plan to engage in the stock and loan transactions.

126.    As party to the stock purchase agreement containing the terms of the Plan's stock purchase from Hardwick and countersigned by the Trustee on behalf of the Plan, as the seller of over $74 million in stock in the 2020 Transaction with an interest in having knowledge of and competently negotiating the Transaction, and as officer and director of Churchill that chose the Trustee to be the Plan trustee and bore a fiduciary duty to monitor, Hardwick was aware of sufficient facts that the 2020 Transaction constituted a prohibited transaction. Hardwick is liable for knowingly participating in violations of ERISA § 406(a)(1)(A), (B) and (D), 29 U.S.C. § 1106(a)(1)(A), (B) and (D), alleged in Count I.

127.    As a result of the Count II ERISA § 404(a) breaches of fiduciary duty described above, Hardwick received Plan assets in payment above fair market value for his Churchill stock.

128.    Hardwick knew or should have known that the Plan overpaid for Churchill stock and that the Trustee's investigation was inadequate. Churchill management working under Hardwick provided company information to the buyer side. Hardwick, and the Board, through Churchill, appointed the Trustee as fiduciary trustee, and thus had a duty to monitor. Hardwick, as the senior Churchill officer and as Chairman of the Board of Directors, knew or should have known facts regarding the scope of the Trustee's due diligence, the overly optimistic projections

and other information provided to the Trustee and its advisors by Churchill management, and company valuations, sufficient to give him knowledge of the Trustee's investigatory and valuation deficiencies and that the Plan overpaid. Hardwick knew that for all practical purposes he and his lieutenants, and not the ESOP, would continue to exercise control over Churchill. Hardwick knew or should have known such facts as seller participant in the Transaction.

129.    Hardwick is liable for the violations alleged in Count II.

130.    Hardwick profited from the prohibited transactions and breaches of fiduciary duty in an amount to be proven at trial, and upon information and belief, he remains in possession of some or all of the assets that belong to the Plan.

131.    Hardwick is subject to appropriate equitable relief including disgorgement of any ill-gotten gains he received in connection with the 2020 Transaction, accounting for profits, having a constructive trust placed on any proceeds received (or which are traceable thereto), reformation of the 2020 Transaction contracts to provide the Plan pays no more than fair market value for Churchill stock as of the date of the Transaction and to give the Plan powers or other consideration for which it paid but did not receive including control of Churchill, having the transaction rescinded, requiring all or part of the consideration to be restored to the Plan, or to be subject to other appropriate equitable relief.

## COUNT V

**Co-Fiduciary Liability Under ERISA § 405(a), 29 U.S.C. § 1105(a),**
**Against the Board Defendants Regarding the 2020 Transaction**

132.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

133.    ERISA § 405(a)(1), 29 U.S.C. § 1105(a)(1), provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with

respect to the same plan . . . if he participates knowingly in, or knowingly undertakes to conceal, an act or omission of such other fiduciary, knowing such an act or omission was a breach."

134.     ERISA § 405(a)(2), 29 U.S.C. § 1105(a)(2), further provides liability on a fiduciary "if, by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach."

135.     ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), further provides liability on a fiduciary "if he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

136.     Board Defendants were members of the Churchill Board of Directors with authority to appoint and remove a fiduciary ESOP Committee and the fiduciary trustee and to control the fiduciary Plan Administrator Churchill, and thus each Board Defendant was a fiduciary with respect to the Plan at the time of the 2020 Transaction.

137.     Given the sale of their company to their employees through their company's ESOP; their positions as directors and officers, including the President, CEO, CFO and COO; their involvement in conceiving of, facilitating, and executing the 2020 Transaction; their approval of the Articles of Amendment to the Charter of Churchill Holdings, Inc. on or about December 22, 2020 so to facilitate the 2020 Transaction and "special year-end dividend" to stock newly-owned by the Plan; their access to company financial information and provision of such information to the Trustee; and their appointment of the Trustee, Board Defendants knew or should have known of the fiduciary breaches of the Trustee in connection with its faulty due diligence and imprudent approval of the stock purchase for more than fair market value, knowingly participated in the Trustee's fiduciary breaches, and enabled the Trustee's fiduciary

breach by themselves failing to monitor or to take action on information known to them, as required of an appointing fiduciary.

138.    As such, under ERISA § 405(a)(1)-(2), 29 U.S.C. § 1105(a)(1)-(2), Board Defendants are liable as co-fiduciaries for the Plan's losses resulting from the Trustee's fiduciary breaches.

139.    Board Defendants failed to make reasonable efforts to remedy the Trustee's violations of ERISA associated with the 2020 Transaction despite knowing of such violations, such as preventing the Plan's overpayment, reimbursing the Plan, or bringing the matter to the attention of the Secretary of Labor.

140.    Pursuant to ERISA § 405(a)(3), 29 U.S.C. § 1105(a)(3), Board Defendants are liable as co-fiduciaries for the Plan's losses resulting from the Trustee's fiduciary breaches.

## CLASS ACTION ALLEGATIONS

141.    Plaintiffs bring this action as a class action pursuant to Fed. R. Civ. P. 23(a) and (b), on behalf of the following class:

> All vested participants in the Churchill Holdings, Inc. Employee Stock Ownership Plan ("Plan") and the beneficiaries of such participants during the period from May 26, 2017 to the present. Excluded from the Class are the Defendants and their immediate families; and legal representatives, successors, and assigns of any such excluded persons.

142.    The Class is so numerous that joinder of all members is impracticable. Although the exact number and identities of Class members are unknown to Plaintiffs at this time, the Plan's most recent Form 5500 filing reports that as of December 31, 2021, there were 649 participants in the Plan.

143.    Questions of law and fact common to the Class as a whole include, but are not limited to, the following:

i.    Whether Defendants Miguel Paredes, and Prudent Fiduciary Services, LLC served as trustee in the Plan's acquisition of Churchill stock;

ii.   Whether the Trustee was an ERISA fiduciary of the Plan;

iii.  Whether the Trustee caused the Plan to engage in prohibited transactions under ERISA by permitting the Plan to purchase Churchill stock and take loans from parties in interest;

iv.   Whether the Trustee engaged in good faith valuations of the Churchill stock in connection with the 2020 Transaction;

v.    Whether the Trustee caused the Plan to pay more than fair market value for Churchill stock;

vi.   Whether the Trustee breached its fiduciary duty to undertake an appropriate and independent investigation of the fair market value of Churchill stock on in 2020;

vii.  Whether Hardwick was a party in interest;

viii. Whether Hardwick gave loans to the Plan;

ix.   Whether Churchill was a party in interest and gave a loan to or transacted with the Plan by assuming the debt to Hardwick;

x.    Whether Hardwick knowingly participated in the prohibited stock transaction and breaches of fiduciary duty;

xi.   Whether the Board Defendants were fiduciaries;

xii.  Whether the Board Defendants breached their fiduciary duties by allowing dividends to be used to offset corporate obligations instead of for the benefit of the Plan and its participants;

xiii. Whether the Board Defendants are liable as co-fiduciaries for the fiduciary breaches by the Trustee;

xiv. The amount of losses suffered by the Plan and its participants as a result of the Trustee's ERISA violations; and

xv. The appropriate relief for Defendants' violations of ERISA.

144. Plaintiffs' claims are typical of those of the Class. For example, Plaintiffs, like other Plan participants in the Class, suffered a diminution in the value of their Plan accounts because the Plan paid above fair market value and took on excessive loans for Churchill stock, resulting in their being allocated fewer shares of stock, and they continue to suffer such losses in the present because the Trustee failed to correct the overpayment by the Plan.

145. Plaintiffs will fairly and adequately represent and protect the interests of the Class. Plaintiffs have retained counsel competent and experienced in complex class actions, ERISA, and employee benefits litigation.

146. Class certification of Plaintiffs' Claims for Relief for the alleged violations of ERISA is appropriate pursuant to Fed. R. Civ. P. 23(b)(1) because adjudications with respect to individual Class members would as a practical matter be dispositive of the interests of non-party Class members, and/or because the prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications which would establish incompatible standards of conduct for Defendants.

147. The names and addresses of the Class members are available from the Plan. Notice will be provided to all members of the Class to the extent required by Fed. R. Civ. P. 23.

## **PRAYER FOR RELIEF**

Wherefore, Plaintiffs pray for judgment against Defendants and for the following relief:

A.   Declare that Defendant Trustee caused the Plan to engage in prohibited transactions and thereby breached its duties under ERISA

B.   Declare that Defendant Trustee breached its fiduciary duties under ERISA to the Plan and the class members;

C.   Declare that the Board Defendants breached their fiduciary duties under ERISA to the Plan and the class members;

D.   Declare that Defendant Hardwick knowingly participated in prohibited stock and loan transactions with the Plan in violation of ERISA;

E.   Declare that the Board Defendants are liable as co-fiduciaries for Defendant Trustee's breaches of fiduciary duty;

F.   Order Defendants to make good to the Plan and/or to any successor trust(s) the losses resulting from the violations of ERISA and disgorge any profits they made through use of assets of the Plan;

G.   Order reformation of the 2020 Transaction contracts to provide the Plan pays no more than fair market value for Churchill stock as of the date of the transaction, to provide the Plan receives that for which it paid including control of Churchill where it did not receive a discount for lack of control and did not obtain control of the Churchill board of directors under contractual governance provisions, and any other appropriate reformation;

H.   Order rescission of the 2020 Transaction;

I.   Order that Defendants provide other appropriate equitable relief to the Plan and its participants and beneficiaries, including but not limited to surcharge, providing an

accounting for profits, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by Defendants;

J.    Order the proceeds of any recovery for the Plan to be allocated to the accounts of the class members to make them whole for any injury that they suffered as a result of the breaches of ERISA in accordance with the Court's declaration;

K.    Order the allocation to the accounts of the class members of the additional shares of stock that would have been allocated but for the Plan's overpayment on company stock and Defendants' breaches of ERISA;

L.    Remove the Trustee as Plan fiduciary, enjoin it from acting as a fiduciary for any employee benefit plan that covers or includes any Churchill employees or members of the Class, and appoint an independent fiduciary in place of the Trustee;

M.    Remove the Board Defendants as Plan fiduciaries, enjoin them from acting as a fiduciary for any employee benefit plan that covers or includes any Churchill employees or members of the Class, and appoint an independent fiduciary in place of the Board Defendants;

N.    Award Plaintiffs reasonable attorneys' fees and costs of suit incurred herein pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g), and/or for the benefit obtained for the common fund;

O.    Enjoin Defendants from dissipating any of the proceeds they received from the 2020 Transaction held in their actual or constructive possession until the Plan participants' rights can be adjudicated;

P.    Enjoin Defendants from transferring or disposing of any of the proceeds they received from the 2020 Transaction to any person or entity, which would prejudice, frustrate, or impair the Plan participants' ability to recover the same;

Q.    Order Defendants to pay prejudgment and post-judgment interest;

R.    Certify this action as a class action pursuant to Fed. R. Civ. P. 23, certify the named Plaintiffs as class representative and their counsel as class counsel; and

S.    Award such other and further relief as the Court deems equitable and just.


Dated: May 26, 2023                     Respectfully submitted,


By: /s/Benjamin A. Gastel_____

Benjamin A. Gastel (BPR #28699)
**Herzfeld, Suetholz, Gastel, Leniski**
 **& Wall, PLLC**
223 Rosa L. Parks Ave., Ste 300
Nashville, TN 37203
Telephone: (615) 800-6225
Facsimile: (615) 994-8625
ben@hsglawgroup.com

Alyson S. Beridon (BPR #40040)
**Herzfeld, Suetholz, Gastel, Leniski**
 **& Wall, PLLC**
425 Walnut St., Ste 2315
Cincinnati, OH 45202
Ph: 513-381-2224
Email: alyson@hsglawgroup.com

Gregory Y. Porter (*pro hac to be filed*)
Ryan T. Jenny (*pro hac to be filed*)
Mark G. Boyko (*pro hac to be filed*)
**Bailey Glasser LLP**
1055 Thomas Jefferson St., NW, Suite 540
Washington, DC 20007

34

Telephone: (202) 463-2101
Facsimile: (202) 463-2103
gporter@baileyglasser.com
rjenny@baileyglasser.com
mboyko@baileyglasser.com

Robert A. Izard (*pro hac vice to be filed*)
Douglas P. Needham (*pro hac vice to be filed*)
Christopher M. Barrett (*pro hac vice to be filed*)
**IZARD, KINDALL & RAABE, LLP**
29 South Main Street, Suite 305
West Hartford, CT 06107
(860) 493-6292
(860) 493-6290 fax
rizard@ikrlaw.com
dneedham@ikrlaw.com
cbarrett@ikrlaw.com

*Attorneys for Plaintiffs*