# EXHIBIT I

FIFTH EDITION

# VALUING A BUSINESS

## The Analysis and Appraisal of Closely Held Companies

SHANNON P. PRATT

with Alina V. Niculita

Case 3:23-cv-00545 Document 40-10 Filed 08/08/23 Page 2 of 7 PageID #: 771

# Valuing a Business

## The Analysis and Appraisal of Closely Held Companies

Fifth Edition

Shannon P. Pratt, CFA, FASA, MCBA, MCBC, CM & AA
Chairman and CEO
*Shannon Pratt Valuations, Inc.*

Alina V. Niculita, CFA, MBA
President and COO
*Shannon Pratt Valuations, Inc.*

McGraw Hill

New York • Chicago • San Francisco • Lisbon • London
Madrid • Mexico City • Milan • New Delhi • San Juan
Seoul • Singapore • Sydney • Toronto

Case 3:23-cv-00545 Document 40-10 Filed 08/08/23 Page 3 of 7 PageID #: 772

Copyright © 2008 by The McGraw-Hill Companies, Inc. All rights reserved. Manufactured in the United States of America. Except as permitted under the United States Copyright Act of 1976, no part of this publication may be reproduced or distributed in any form or by any means, or stored in a database or retrieval system, without the prior written permission of the publisher.

0-07-150935-6

The material in this eBook also appears in the print version of this title: 0-07-144180-8.

All trademarks are trademarks of their respective owners. Rather than put a trademark symbol after every occurrence of a trademarked name, we use names in an editorial fashion only, and to the benefit of the trademark owner, with no intention of infringement of the trademark. Where such designations appear in this book, they have been printed with initial caps.

McGraw-Hill eBooks are available at special quantity discounts to use as premiums and sales promotions, or for use in corporate training programs. For more information, please contact George Hoare, Special Sales, at george_hoare@mcgraw-hill.com or (212) 904-4069.

TERMS OF USE

This is a copyrighted work and The McGraw-Hill Companies, Inc. ("McGraw-Hill") and its licensors reserve all rights in and to the work. Use of this work is subject to these terms. Except as permitted under the Copyright Act of 1976 and the right to store and retrieve one copy of the work, you may not decompile, disassemble, reverse engineer, reproduce, modify, create derivative works based upon, transmit, distribute, disseminate, sell, publish or sublicense the work or any part of it without McGraw-Hill's prior consent. You may use the work for your own noncommercial and personal use; any other use of the work is strictly prohibited. Your right to use the work may be terminated if you fail to comply with these terms.

THE WORK IS PROVIDED "AS IS." McGRAW-HILL AND ITS LICENSORS MAKE NO GUARANTEES OR WARRANTIES AS TO THE ACCURACY, ADEQUACY OR COMPLETENESS OF OR RESULTS TO BE OBTAINED FROM USING THE WORK, INCLUDING ANY INFORMATION THAT CAN BE ACCESSED THROUGH THE WORK VIA HYPERLINK OR OTHERWISE, AND EXPRESSLY DISCLAIM ANY WARRANTY, EXPRESS OR IMPLIED, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE. McGraw-Hill and its licensors do not warrant or guarantee that the functions contained in the work will meet your requirements or that its operation will be uninterrupted or error free. Neither McGraw-Hill nor its licensors shall be liable to you or anyone else for any inaccuracy, error or omission, regardless of cause, in the work or for any damages resulting therefrom. McGraw-Hill has no responsibility for the content of any information accessed through the work. Under no circumstances shall McGraw-Hill and/or its licensors be liable for any indirect, incidental, special, punitive, consequential or similar damages that result from the use of or inability to use the work, even if any of them has been advised of the possibility of such damages. This limitation of liability shall apply to any claim or cause whatsoever whether such claim or cause arises in contract, tort or otherwise.

DOI: 10.1036/0071441808

acting under compulsion and when both have reasonable knowledge of the relevant facts."[6] This definition comports to that found in the Internal Revenue Code and Revenue Ruling 59-60.

In most interpretations of fair market value, the willing buyer and willing seller are hypothetical persons dealing at arm's length, rather than any particular buyer or seller. In other words, a price would not be considered representative of fair market value if influenced by special motivations not characteristic of a typical buyer or seller.

There is also general agreement that the definition implies that the parties have the ability as well as the willingness to buy or to sell. The *market* in this definition can be thought of as all the potential buyers and sellers of like businesses or practices.

The concept of fair market value also assumes prevalent economic and market conditions at the date of the particular valuation. You have probably heard someone say, "I couldn't get anywhere near the value of my house if I put it on the market today," or, "The value of XYZ Company stock is really much more (or less) than the price it's selling for on the New York Stock Exchange today." The standard of value that those people have in mind is some standard *other than* fair market value, since the concept of fair market value means the price at which a transaction could be expected to take place under *conditions existing at the valuation date*.

The terms *market value* and *cash value* are frequently used interchangeably with the term *fair market value*. The use of these essentially synonymous standard of value terms is often influenced by the type of asset, property, or business interest subject to valuation.

In the United States, the most widely recognized and accepted standard of value related to real estate appraisals is *market value*. The Appraisal Foundation defines *market value* as follows:

> MARKET VALUE: Market value is the major focus of most real property appraisal assignments. Both economic and legal definitions of market value have been developed and refined. A current economic definition agreed upon by agencies that regulate federal financial institutions in the United States of America is:
>
>> The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:
>>
>> **1.** buyer and seller are typically motivated;
>> **2.** both parties are well informed or well advised, and acting in what they consider their best interests;
>> **3.** a reasonable time is allowed for exposure in the open market;
>> **4.** payment is made in terms of cash in United States dollars or in terms of financial arrangements comparable thereto; and

[6] American Society of Appraisers, Business Valuation Standards—Definitions.

Stock options are derivative securities whose values are contingent upon the value of publicly traded or privately held common stock. There are many kinds of publicly traded derivative securities that depend on stock indices, currencies, futures contracts, and interest rates. Derivatives can be contingent on almost any variable, from the price of beans to the amount of snow falling at a ski resort. There are even options on options, called compound options. Some stock options are created specifically by a corporate acquirer to meet the particular needs of the holder of a corporate seller's equity. Others are made available to corporate clients by financial institutions or added to new issues of securities by underwriters. Derivative securities are being used more frequently by closely held businesses when their owners plan their estates, create an employee stock-ownership plan, provide employee incentives, and make corporate acquisitions and divestitures.

The derivative securities this chapter addresses are call options to purchase the common stock of either a publicly traded or a closely held company. This chapter explores the components of stock option values, including employee incentive stock options, for both income tax and financial reporting purposes. It discusses the factors relevant to the value of stock options, and explains the most widely recognized models in current use for the valuation of stock options. Finally, so-called "real options" are introduced.

Some of the stock options discussed in this chapter are called warrants in the public markets rather than options. Publicly traded options usually are issued by third parties and are settled with already outstanding common shares or cash. Warrants are issued by the company and (like employee stock options) are settled in additional outstanding common shares of the company. The initial time allowed to exercise a publicly traded warrant usually is much longer than for a publicly traded option.

## Common Situations Requiring the Valuation of Options

The situations commonly requiring valuation of such securities are the following:

1. When the option is designed, granted, exchanged, or terminated
2. When the option value is disclosed in a company proxy statement disclosure
3. When financial statement disclosure requires that the option value is recognized
4. When the option value is required for determination of compensation of an executive for income tax purposes
5. When the option is transferred to a third party
6. When the option value is at issue in a damage suit, such as a breach of contract suit between an existing or former executive and the issuing company
7. When the option is a repurchased option by the issuing company
8. When the option value is required in the divorce of an executive who holds the option

## Terminology

The most common form of stock option is the *call* option. In its simplest form, it is the right to buy a specific number of a company's common shares at a specific

price for specific period of time. The opposite of a call option is a *put* option which is the right to sell a specific number of common shares for a specific price and period of time.

The financial analysis of stock options has become a specialty area in its own right, complete with its own jargon. Here is an explanation of some of the more common terms:

- The *option premium* is the market price of the option.
- The *strike, or exercise, price* is the fixed price at which the option is exercisable.
- The *expiration date* is the last date on which the holder may exercise his or her right.
- The *term* or *remaining life* of the option is the time between the valuation date and the option's expiration date.
- *Perpetual* options and warrants have no expiration date.
- A *European* option may only be exercised on the expiration date.
- An *American* option may be exercised at any time through the expiration date.
- The *early exercise premium* is the difference in value between an American option and a European option due solely to the ability to exercise an American option before the expiration date.
- The *underlying stock* is the common stock received when the option is exercised.
- The *intrinsic value* of an option is the difference between the price of its underlying stock and its strike price. It is never less than zero.
- *Time value* of a stock option is the difference between its price and its intrinsic value. Often it is better for the holder of an option to delay paying the exercise price to take advantage of the time value of money rather than exercising the option immediately.
- An option is *in-the-money* if the value of its underlying stock exceeds the exercise price.
- An option is *at-the-money* if the value of its underlying stock equals the exercise price.
- An option is *out-of the-money* if the value of its underlying stock is less than the exercise price.

While options that are at-the-money or out-of-the-money have no intrinsic value, they still can have time value.

## The Basic Call Option Equation

A call option allows an investor to share in the potential capital appreciation of the common stock of a company with less risk of a major loss than from owning the stock directly. Imagine that an investor in the common stock of a company has two choices, either to (1) buy 100 shares of a company's common stock at $10 per share or (2) to purchase a call for $125 to purchase 100 shares at the same $10 price at the end of nine months. If the investor chooses to buy the stock, the investor must pay $1,000 immediately and is at risk for the entire $1,000 investment. If the investor chooses to purchase the call option, the investor will pay only $125 immediately and can wait until the option's expiration date to decide whether or not to buy the stock for an additional $1,000. The investor's risk is limited to $125. If the option is in-the-money (the price of the stock is above the strike price),

Case 3:23-cv-00545 Document 40-10 Filed 08/08/23 Page 7 of 7 PageID #: 776